118 So.2d 796 (1960)
LeRoy COLLINS, Governor of Florida, Ray E. Green, Comptroller, J. Edwin Larson, Treasurer, Richard W. Ervin, Attorney General, Nathan Mayo, Commissioner of Agriculture, As and Constituting Trustees of Internal Improvement Fund of State of Florida, and Lamar Johnson, Charlotte Properties, Inc., Appellants,
v.
COASTAL PETROLEUM COMPANY, a Florida Corporation, Appellee.
No. A-359.
District Court of Appeal of Florida. First District.
January 19, 1960.
Rehearing Denied March 28, 1960.
On Motion to Certify Decision to March 31, 1960.
*797 Richard W. Ervin, Atty. Gen., Ralph M. McLane, Asst. Atty. Gen., H. Rex Owen, Sp. Asst. Atty. Gen., Edward A. Bosarge, Bartow, and Farr & Farr, Punta Gorda, for appellants.
Caldwell, Parker, Foster, Madigan, Oven & Moriarty, Tallahassee, and Reasoner & Davis, Washington, D.C., for appellee.
On Motion to Certify Decision to Supreme Court March 31, 1960.
*798 PER CURIAM.
In the Trial Court the appellee sought a declaratory decree defining its rights under certain leases executed by the Trustees of the Internal Improvement Fund of Florida. Appellee contended that the leases granted to it the right to explore for and recover "all minerals including particularly the metallic minerals such as rutile, ilmenite, monazite, zircon and titanium" from certain described areas of gulf, river, and lake bottoms.
The Trustees contended that the leases did not grant to the appellee Coastal the right to explore for the so-called metallic minerals. Appellants Johnson and Charlotte Properties, Inc., a Florida Corporation, assert rights to explore for these minerals under separate leases executed by the Trustees.
After an extensive and detailed study of the record and consideration of the briefs submitted by the parties, we have concluded that we can add little to the comprehensive opinion prepared by the Chancellor in support of a final decree in favor of the appellee. Except as to elimination of footnotes and insertion of authorities, we therefore, quote his opinion in extenso as follows:
"In 1941 plaintiff entered into a contract with the trustees which was designated `Exploration Contract for oil, Gas, and Minerals and Option to Lease.' This contract was entered into pursuant to the authority of the trustees granted by chapter 20680, Laws of Florida, Acts of 1941 [F.S.A. § 270.28, and note]. This was a valid contract. This contract and the statute under which it was entered into will later be discussed in greater detail. Watson v. Holland, 1945, [155 Fla. 342], 20 So.2d 388.
"In 1944 the trustees and plaintiff entered into three contracts each termed a `drilling lease' under which plaintiff was granted the right to produce from described areas `oil, gas and sulphur.' These contracts were designated by the numbers 224-A, 224-B and 248. Each recites that it was executed pursuant to the exploration contract above mentioned, and specifically refers to chapter 20680. These contracts were re-executed in 1947 with certain changes, immaterial here, considered necessary by reason of the `tidelands' litigation.
"On November 21, 1950, the trustees adopted a motion:
"`that a letter be directed to Dr. Arnold and to Coastal Petroleum Company, indicating that potash and other minerals are included in leases 224A and 224-B, with royalty on all minerals, except payment for sulphur, be at the usual rate of ten percent (10%) of production or of value'.
"Under date of January 16, 1951, the following appears in the minutes of the trustees:
"`Mr. Elliot present request from Coastal Petroleum Company that the trustees allow footage drilled for minerals other than oil, especially potash, to be credited on their contracts Nos. 224-A and 224-B. Motion was made by Mr. Larson, seconded by Mr. Ervin, that the request be granted subject to approval of such action by the Attorney General. Upon vote the motion was adopted.'
"The minutes of a meeting of the trustees held on March 6th, 1951, show the following action:
"`The Engineer and Secretary stated that under Contracts 224-A, 224-B and 248, as modified, with Coastal Petroleum Company, the company had to date drilled for the primary purpose of discovering oil, and gas, but that it was contemplated that there might be occasion to drill for other minerals and it was desired to make provision for the crediting of footage under the said contracts in case of such drilling, and also to make provision for the rate of royalty *799 in case of production of other minerals.
"`After discussion, motion was made by Mr. Larson, seconded by Mr. Mayo and unanimously carried, that the following resolution be adopted:
"`Resolution
"`Be It Resolved that in the event wells should be drilled under Contracts 224-A, 224-B and 248, as modified, for discovery of minerals other than oil, gas or sulphur, the footage of such wells shall be credited against required footage for wells drilled under said contract, provided that such wells are drilled to a minimum depth of one thousand (1000) feet, or to a lesser depth if the desired minerals are discovered and produced in commercial quantities from a lesser depth, and
"`Be It Resolved, that in the event minerals other than oil, gas and sulphur are produced under the said contracts, the lessee shall pay to the Trustees as royalty thereon ten (10) per cent of the production, or the market value of such minerals.
"`The Secretary was requested to furnish certified copy of the above resolution to Coastal Petroleum Company for making a part of their contracts, and to have a copy attached to the copy of leases filed in the Land Office.'
"After the adoption the resolutions above quoted and prior to the action of the trustees hereafter mentioned the plaintiff in reliance upon the contracts and minutes above outlined, employed a geologist for the purpose of exploring the leased areas for various types of heavy or metallic minerals and in addition to the salary paid such geologist expended approximately five thousand dollars in preliminary work leading up to a comprehensive survey of the leased areas in search of commercially valuable deposits of such minerals.
"But on March 23, 1954, the trustees adopted the following resolution:
"`Resolution
"`Whereas, we, the trustees of the Internal Improvement Fund of the State of Florida, entered into three oil, gas and sulphur leases with the Arnold Oil Explorations, Inc.. a Florida Corporation, to wit:
"`Drilling Lease No. 248, dated December 19, 1944, embracing about 660,736 acres of sovereignty lands;
"`Drilling Lease No. 224-A, dated December 27, 1944, embracing about 1,936,100 acres of sovereignty lands (subsequently adjusted to about 688,660 acres); and
"`Drilling Lease No. 224-B, dated March 27, 1946, embracing about 1,974,360 acres of sovereignty lands (subsequently adjusted to about 745,560 acres).
And,
"`Whereas, the corporate name of the Arnold Oil Explorations was subsequently changed to Coastal Petroleum Company; and
"`Whereas, on March 6, 1951, the following action was taken:
"`The Engineer and Secretary stated that under Contracts 224-A, 224-B and 248, as modified, with Coastal Petroleum Company, the company had to date drilled for the primary purpose of discovering oil and gas, but that it was contemplated that there might be occasion to drill for other minerals and it was desired to make provision for the crediting of footage under the said contracts in case of such drilling, and also to make provision for the rate of royalty in case of production of other minerals.
"`After discussion, motion was made by Mr. Larson, seconded by Mr. Mayo and unanimously carried, that the following resolution be adopted.

*800 "`Resolution
"`Be It Resolved that in the event wells should be drilled under Contracts 224-A, 224-B and 248, as modified, for discovery of minerals other than oil, gas or sulphur, the footage of such wells shall be credited against required footage for wells drilled under said contract, provided that such wells are drilled to a minimum depth of one thousand (1000) feet, or to a lesser depth if the desired minerals are discovered and produced in commercial quantities from a lesser depth, and
"`Be It Resolved, that in the event minerals other than oil, gas and sulphur are produced under the said contracts, the lessee shall pay to the Trustees as royalty thereon ten (10) per cent of the production, or the market value of such minerals.
"`The Secretary was requested to furnish certified copy of the above resolution to Coastal Petroleum Company for making a part of their contracts, and to have a copy attached to the copy of leases filed in the Land Office.
"`And,
"`Whereas, the question has now arisen as to what minerals other than oil, gas and sulphur, are included within the purview of the said resolution of March 6, 1951, which provides for the drilling of wells "for discovery of minerals other than oil, gas and sulphur * * *"; and,
"`Whereas, we are reliably informed that minerals commercially produced from wells "include halite (common table salt) and other natural soluble salts; petroleum and petroleum products; gas, including petroleum, helium and rarely others such as carbon dioxide; sulphur; and brines from which borax and borates, alum, epsomite and rare elements are extracted and concentrated". That the same are the only mineral substances commercially produced from wells. That rutile, ilmenite, zircon and other metallic bearing minerals are not produced from well borings.
"`Now, Therefore, Be It Resolved, that under the said resolution of March 6, 1951, the said drilling lease agreements above mentioned were amended to include halite (common table salt) and other natural soluble salts, petroleum and petroleum products, gas, including petroleum, helium and rarely others such as carbon dioxide, sulphur, and brines from which borax and borates, alum, epsomite and rare elements are extracted and concentrated, but said amendment did not include rutile, ilmenite, zircon and other metallic bearing minerals.'"
"This resolution, and the insistance of the trustees upon the position therein asserted, led to the present suit. The delay in institution of this suit from March 23, 1953, to November 23, 1956, is reasonably explained by the pedency of a proceeding in eminent domain in which the same questions were involved and an abortive effort to litigate the entire question in another case in the federal court. Coastal Petroleum Co. v. Collins [D.C.], 135 F. Supp. 203, modified [5 Cir.], 234 F.2d 319.
"Subsequent to the adoption of the resolution of March 23, 1954, the trustees entered into two leases each relating to part of the area covered by plaintiff's leases as follows:
"A lease to Charlotte dated May 5, 1954, granting the right to recover `all minerals, except petroleum and natural gas, and particularly including ilmenite, rutile, other titanium minerals, zircon, monazite, and accessory and assorted minerals used in modern industry', from a part of the area embraced within plaintiff's lease No. 224-B.
"A lease to Johnson dated October 4, 1955, granting the right to recover `all minerals, except petroleum, natural gas and sulphur, and particularly including ilmenite, rutile, zircon, monazite, titanium, and accessory *801 similar and associated minerals used in modern industry', from a part of the area embraced within plaintiff's lease No. 248.
"On November 2, 1954, the United States District Court for the Southern District of Florida entered a decree which is, in part, as follows:
"`That the Drilling Lease No. 224-A, between the Trustees of the Internal Improvement Fund of the State of Florida, and Coastal Petroleum Company, as modified February 27, 1947, and as further modified and construed by later resolution of the Trustees of the Internal Improvement Fund for the State of Florida (a copy thereof being attached as Exhibits B, C, and D to the petition for declaratory judgment of Coastal Petroleum Company filed herein September 20th, 1954), is held and construed by the Court to include all minerals, including metallics, whether procured from wells or otherwise, and that the said Drilling lease No. 224-A as modified, is a legal, valid and subsisting grant.'
"This decree was entered in a proceeding in eminent domain in which the United States was petitioner and in which the trustees were parties defendant, but to which neither Charlotte or Johnson were parties.
"It is clearly made to appear that the determination of the relative rights of the trustees and Coastal to the minerals which might be found in the territory embraced in lease No. 224-A was necessary to the proper adjudication of the condemnation case, that the question of the extent of the mineral rights granted by that lease was squarely presented to and decided by the District Court as a necessary incident to the determination of the amount of compensation to be paid to the trustees and to Coastal respectively for the property being acquired by the United States.
"Plaintiff contends that this decision by the Federal Court establishes an estoppel by judgment against the trustees effective as to all the leases because of their almost identical language and that this estoppel operates against Johnson as a privy of the trustees who acquired his interest subsequent to the decree. Cases cited tend to support this argument insofar as the Trustees are concerned. It is doubtful if the facts are such as to bring Johnson within the estoppel and clearly Charlotte, whose rights, if any, were acquired and had become vested prior to the entry of this judgment, is not bound by the holding of the Federal Court. This court prefers to decide the case before it as a whole and will not further examine this question of estoppel by judgment, but will give the decision of the United States court only that weight which it should have as stare decisis.
"The exploration contract of 1941 was entered into pursuant to Chapter 20680, Laws of Florida, Acts of 1941. It will be noted that section 1 of this chapter authorizes `petroleum oil and gas leases' and makes no reference to other minerals or substances. But section 2 of this chapter authorizes the trustees to `sell and convey any and all of the petroleum oil and/or gas and/or any other mineral of any kind whatsoever, lying and being in or under any of the lands and/or water bottoms in this state, the legal title to which lands and/or water bottoms is vested by law, or otherwise, in such state board or boards; and to execute good and sufficient royalty deeds conveying such interests in such petroleum oil and/or gas and/or other mineral as may be agreed upon * * *'
"The exploration contract, executed pursuant to this statute, authorizes exploration of the areas affected and requires that samples of all `cuttings, cores and deposits' be delivered to the trustees. It refers to `the rights herein granted to explore for oil, gas and other minerals.' It grants to the lessee the right to receive from the trustees `oil, gas and mineral leases to be known as "Drilling Leases"'. When this contract is construed in connection with the statute under which it was executed it is abundantly clear that the terms `other minerals' *802 and `mineral leases' when used without limiting words, refer to minerals `of any kind whatsoever' because the statute itself so describes them.
"It follows that when plaintiff performed its obligations under the exploration contract and exercised its options therein granted it became legally entitled to receive `oil, gas and mineral leases'.
"The leases actually given to plaintiff, if taken alone and without consideration of the exploration contract, could not reasonably be construed as conveying any rights in minerals other than petroleum, gas and sulphur. Each lease is `for the sole and only purpose of prospecting, drilling, mining and operating for the production of oil, gas and sulphur'. While reference is made in the leases to `oil, gas or other minerals' and to `gas, oil or other minerals' and to `petroleum and/or gas, or other valuable substances', it will be noted that at no place can we find the words `other minerals' or `other valuable substances' after an enumeration of substances including sulphur. Proper construction of the leases, standing alone, would impel the conclusion that the words `other minerals' and `other valuable substances' referred to sulphur and possibly derivatives of petroleum such as casinghead gasoline.
"Whether, as plaintiff contends, it is proper to take this slight ambiguity in the leases and by construing the leases with the exploration contract create uncertainty as to the meaning of the leases and then employ the quoted resolutions of the trustees as clarifying this uncertainty is extremely doubtful. The court prefers to base its conclusion upon a much simpler and sounder process of reasoning.
"When plaintiff performed the exploration contract it became legally entitled to leases covering `oil, gas and other minerals.' If the leases given it did not include `other minerals' it could at that time have refused to accept them and demanded leases conforming to the exploration contract. The acceptance of these leases, and the failure to demand more for a period of years would very probably, had the trustees so asserted when the question arose, have constituted a waiver or abandonment of any further rights under the exploration contract. But when the question arose in 1950 it was clearly within the legal and moral rights of the trustees to recognize that the intent and purpose of the exploration contract had not been fully complied with and to take the necessary steps to then give plaintiff all that it had been entitled to receive when the options contained in the exploration contract were exercised. In short, the trustees might have insisted upon a waiver of plaintiffs rights to a lease covering other minerals. They had an equal right to waive their right to assert a waiver on the part of plaintiff. Having done so, and the plaintiff in reliance upon this action having expended substantial funds and embarked upon a program designed to benefit all parties by the commercial development of the minerals involved, the trustees were without lawful authority to repudiate their action in adopting the resolutions quoted.
"This brings us to a construction of the Motions and resolutions of November 21, 1950, January 16 and March 6, 1951, in the light of the position taken in the resolution of March 23, 1954, and now urged before the court, that `other minerals' as used in the resolutions of March 6, 1951, do not include the metallic minerals here involved. This question presents little difficulty.
"The contractual relationship between the parties stems from the exploration agreement which is rooted in the statute, Chapter 20680. This statute uses the expression `other mineral' as meaning `other mineral of any kind whatsoever.' When the trustees used the words `other minerals' in their resolutions relating to the leases executed pursuant to the authority granted by this statute the words should be given the same meaning which they have as they are used in the statute. It follows *803 that the `other minerals' referred to in the resolutions are `other minerals of any kind whatsoever' and include the heavy or metallic minerals. Of course the statute does not require that all minerals be included in any lease, but had the trustees intended to restrict the minerals granted to less than minerals `of any kind whatsoever' we must presume they would have so stated in the resolutions. But the language used implies an opposite intent. In adopting the motion of November 21, 1950, the trustees used the phrase `potash and other minerals.' The words `other minerals' disclose an intent to describe substances other than potash and certainly other than the minerals specifically enumerated in the leases. Use of the phrase `royalty on all minerals, except payment for sulphur' indicates an intent to use the word `minerals' in a broad sense. In the minutes of January 16, 1951, potash is placed in a subordinate position. The expression used is `minerals other than oil, especially potash.' While potash is emphasized it is clearly intended that potash is only a part of the `minerals' referred to. It is very significant that in the resolution of March 6, 1951, the expression used is `minerals other than oil, gas or sulphur'. No reference is made to any other type of mineral. Since oil, gas and sulphur are specifically covered in the original draft of the leases it is apparent that the word `minerals' is used in a broad sense in this resolution. It is also significant that the royalty on oil and gas is fixed at one-eighth of production and the royalty on sulphur at fifty cents per ton in the original leases, but royalty on the other minerals without further particularization is fixed by the motion of November 21, 1950, and the resolution of March 6, 1951, at ten percent of production.
"The court is convinced that the intent of the quoted motions and particularly the resolution of March 6, 1951, was to use the words `other minerals' with the meaning given these words in chapter 20680, and that they include all minerals of any kind whatsoever.
"In opposition to this construction the defendants point out that the leases are couched in language peculiar to the production of petroleum, gas, sulphur, and water soluble minerals by the boring of wells, that provision is made for some regulation of the boring of wells and some limitations of the location of wells, and that the resolution of March 6th refers specifically to the drilling of wells. On the other hand neither the leases nor the minute entries referred to make any reference to strip-mining, open-pit mining, or dredging for minerals. From these facts they argue that the intent of the trustees was to limit the method of recovering minerals to use of wells and to limit the minerals to be recovered by the lessee to those minerals capable of production through wells. The weakness of this argument lies in the fact that it attempts to restrict the meaning of the words of the resolution by an implication much weaker than the presumption that the words were used in the resolutions in the same sense in which they were used in the statute under which the leases were entered into. It is also worthy of note that much of the language of the leases relating to wells and drilling was required by the statute, which makes the drilling of wells a condition to the leases remaining in effect. The reference to the drilling of wells in the resolution of March 6th, 1951, it will be noted, refers to the allowance of credit upon the total footage of wells required by the leases for wells drilled in exploring for other minerals than oil or gas. It is apparently the theory of the statute, and of the leases, that the primary consideration flowing to the state is the lessees' continuous effort to locate and produce oil or gas in commercial quantities. The right to produce other mineral is an incident, although an important one, to this primary purpose. The statute requires the drilling of a specified number of wells. The leases go further and require, in addition to the number of wells, specified footage of drilling. The purpose of that part of the resolution dealing with drilling was to permit credit upon *804 the footage of drilling required by the leases for wells drilled in search of other minerals if carried to a specified depth. This in no way conflicts with a right of the lessee to carry on operations designed to produce other minerals for which they would receive no credit on the drilling requirements of the leases.
"It is not yet known what, if any, deposits of minerals capable of commercial production will be found or the depth below the surface of the water or the bottoms of the waters at which they will be found. Under these circumstances, the omission from the leases of any regulation of the method of production of these minerals is readily understandable. It must be borne in mind that all of the area leased is bottoms of the gulf, rivers and lakes. Should it develop that the method of production of any minerals found unreasonably impairs the public rights of fishing, boating and bathing, the police power of the state may be employed to protect the public interests.
"It is suggested that the leases in and of themselves constitute complete contracts, that the subsequent acts of the parties constitute, at best, a novation and that such a novation is not valid or binding because of lack of consideration. The consideration paid for the original exploration contract is adequate to support the addition to the leases of the provisions covered by the motions and resolutions of the trustees. The expenditures made by plaintiff in performing the leases as modified furnishes further consideration. The statute does not require a present consideration. It specifically authorizes the granting of minerals by `royalty deed', and `under such terms and conditions as may be agreed upon.'
"It is urged that the court should declare the leases of the plaintiff invalid because it is contended adequate protection is not afforded the public in the regulation of the methods which may be employed in producing heavy minerals. This is a question of policy vested by the statute in the trustees. It is an executive function to work out the details of the sale of state property under legislative authority. The Court would have no more authority to declare the leases to Coastal invalid because of this deficiency, if it be a deficiency, than it would to declare the leases to Charlotte and Johnson invalid because they require the payment of a royalty of twenty-five dollars per month and one dollar per ton or two and one half percent of the value of the minerals produced whereas the Coastal lease requires payment of a royalty of ten percent of the minerals produced.
"Other matters urged in opposition to the granting of the relief prayed for are without merit.
"The court is of the opinion that the resolution adopted by the Trustees on March 23, 1954, is a unilateral effort to vary the terms of the contract existing between the trustees and Coastal by placing an unwarranted construction upon the prior action of the trustees, that such resolution is void as affecting plaintiffs rights and plaintiff is entitled to the relief prayed for.
"The decision here announced is fortified by the decision of the Federal District Court mentioned above in which the able District Judge reached the same conclusion although his process of reasoning is not set forth."
Finding no error in the decree of the Chancellor it is hereby affirmed.
It is so ordered.
CARROLL, DONALD K., Acting Chief Judge, and THORNAL and CROSBY, HAROLD B., Associate Judges, concur.

On Motion to Certify Decision to Supreme Court
PER CURIAM.
Upon consideration of appellants' motion that the decision rendered herein on January 19, 1960, 118 So.2d 796 be certified *805 to the Supreme Court of Florida as one that passes upon a question of great public interest within the purview of Section 4(2) of Article V of the Constitution of Florida, F.S.A., this Court does hereby find that the decision in this cause passes upon a question of great public interest and does therefore certify the same to the Supreme Court of Florida.
STURGIS, Acting Chief Judge, CARROLL, DONALD K., J., and THORNAL, Associate Judge, concur.