**COASTAL PETROLEUM COMPANY**

v.

**The UNITED STATES.**

No. 309–72.

United States Court of Claims.

Oct. 22, 1975.

As Amended Jan. 23, 1976.

Irving R. M. Panzer, Washington, D. C., atty. of record, and E. Michael Paturis, Washington, D. C., for plaintiff. C. Dean Reasoner and Reasoner, Davis & Vinson, Washington, D. C., of counsel.

Irwin L. Schroeder, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant.

Before COWEN, Chief Judge, and DAVIS and NICHOLS, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This is a tussle over some limestone at the bottom of Lake Okeechobee in Florida. Plaintiff Coastal Petroleum Company, claiming a compensable interest in the limestone through a lease from an organ of the State of Florida, says that the United States took the mineral without paying for it. The defendant, for its part, asserts, first, that plaintiff has no such compensable interest, and, second, that in any event the Federal Government had the right to use the limestone under its navigation servitude which it exercised in the Lake Okeechobee project. Defendant has moved for summary judgment on this portion of the petition.[1]

For the purposes of this motion, plaintiff is conceded to be the lessee of a valid mineral-drilling lease, granted by the Trustees of the Internal Improvement Fund of the State of Florida, originally let in 1944, modified in 1947 and renewable for five-year terms.[2] This document, Drilling Lease No. 248, grants plaintiff "[a]ll those water bottoms lying within the boundaries of Lake Okeechobee * * * for the purpose of drilling for and producing therefrom oil, gas, sulphur, casinghead gas and casinghead gasoline * * *." Florida has held this lease to cover all minerals.[3]

In 1965, the United States acquired from the Central and Southern Florida Food Control District two easements covering at least part of the same land covered by the Coastal lease, for the purpose of "construction, maintenance and operation" of the levees on Lake Okeechobee authorized by the Act of June 30, 1948, ch. 771, § 203, 62 Stat. 1176.[4] The easements granted the United States by the Flood Control District had previously

---

**1.** Count II of the petition asserts a separate claim under another lease for the taking of limestone in another part of Florida, in the course of the building of the Trans-Florida Canal. That count is not now before us.

**2.** There is now pending in the Fifth Circuit a case challenging on state grounds the existence and validity (after 1964) of plaintiff's leases from the Internal Improvement Fund. The Fifth Circuit has referred the issue to the Supreme Court of Florida. *See infra.* The United States reserves the right to attack the lease on that state ground if its present motion is denied.

**3.** In a 1960 decision as to which certiorari was discharged by the Florida Supreme Court, 125 So.2d 300, the District Court of Appeals of Florida for the First District determined that the lease included drilling rights for all minerals defined in the broadest sense. *Collins v.*

*Coastal Petroleum Co.,* 118 So.2d 796, 803 (Fla.Dist.Ct.App.1960). As a decision on the point by an intermediate state court, which the highest court refused to review, this ruling is binding on us, *Stoner v. New York Life Ins. Co.,* 311 U.S. 464, 467, 61 S.Ct. 8, 85 L.Ed. 284 (1940), and we assume that Coastal's drilling rights included the right to mine limestone.

**4.** The authorizing statute is short and does not contain a description of the project. However, it incorporates by reference the *Comprehensive Report on Central and Southern Florida for Flood Control and Other Purposes, H. R. Doc. No. 643,* 80th Cong., 2d Sess. (1948), which described the program in some detail, and includes plans for "a low levee * * * around the lake shore from the St. Lucie Canal northward to tie in with the present north shore levee." *Ibid.* at 40. The construction of that levee precipitated this suit.

been conveyed to the District by Coastal's lessor, the Florida Internal Improvement Fund, in order to pass them on to the United States. The easements specifically allowed the United States to "dig, excavate or otherwise construct artificial channels or waterways" and to "erect or construct levees and/or dikes." [5]

In the middle or late 1960's, the Corps of Engineers commenced construction of the levee on Lake Okeechobee. It was built "by digging a borrow pit and placing the excavated material on the lake side of the borrow pit." Affidavit of C. W. Pritchett, dated April 14, 1975. In 1968 Coastal filed a suit in the U. S. District Court for the Southern District of Florida in which the company attempted to obtain a mandatory injunction requiring the Corps to issue Coastal a permit to mine limestone in the lake. The permit had been denied because state and local authorities, who were joined as defendants, refused to support the application, largely for environmental reasons. Coastal asked in the alternative for a decree on behalf of either the federal or state defendants condemning its property in either the lease or the minerals and granting compensation. In addition, Coastal asked compensation, against any defendant, for a taking of limestone mined by the Corps and used for the levee. The District Court refused on public policy grounds to grant the injunction, but found that the refusal to grant a permit had worked a taking by the state agencies and that Coastal was entitled to lost profits. *Coastal Petroleum Co. v. Secretary of the Army,* 315 F.Supp. 845, 850 (S.D.Fla.1970). The court did not decide whether there had also been a taking by the federal defend-

ants, because the issue was at that time before the Fifth Circuit in another case. In July, 1970, the Fifth Circuit decided in *Zabel v. Tabb,* 430 F.2d 199 (5th Cir. 1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971), that a refusal by the Corps of Engineers to grant a permit (there, to fill a bay) because the project would have adverse environmental, rather than navigation, effects, was a proper exercise of federal power under the Commerce Clause and, additionally, because of the navigation servitude, did not work a taking of any property rights of the owners of the bed of the bay and land riparian to it. *Ibid.* at 214, 215.

Reacting to *Zabel,* the District Court on October 6, 1970, reversed its earlier decision on the taking issue, and declared that "the federal defendants had the right to deny plaintiff's application to mine in the 5.7 acres applied for, and therefore there was no taking of plaintiff's property in the 5.7 acres." Order, Nos. 68–951–Civ–CA and 69–699–Civ–CA (S.D.Fla. Oct. 6, 1970). The court asked for further briefs on whether the federal defendants should be dismissed or the case transferred to the Court of Claims, evidently on the view that the District Court did not have jurisdiction to declare an inverse condemnation of plaintiff's property if the amount exceeded $10,000. *See* 28 U.S.C. § 1346 (a)(2). In a memorandum decision and order dated February 5, 1971, the District Court dismissed the suit as against the federal defendants, and found that, as a matter of state law, Coastal had acquired by its lease no compensable property right to the minerals in Lake Okeechobee prior to the time they were mined, and that therefore the state defendants were not liable to

---

**5.** The easement provided that the Government did not acquire any right or interest "in and to any such spoil and spoil materials as may be excavated, dredged or otherwise removed from the hereinafter described lands, except for such excavated materials required for the Project Works hereinabove referred to * * *." The reason for this provision is unclear (it may have been designed to keep the United States from having to dispose of the

spoil material), and the parties have not provided us with any information on the intent of either the Government or the Flood Control District. Both parties seem to agree, though, that the limestone is not "spoil" or "spoil material." In that event, the easement says nothing about title to it, although the existence of the proviso suggests that the United States was granted some rights to use materials found in the easement area.

Coastal for any taking by virtue of their having granted the United States the easement to build the levee. Coastal did not appeal either the decision dismissing as against the federal defendants or the determination that its ownership rights under the leases were limited to minerals already mined. The state defendants appealed the court's separate holding that Coastal's lease was currently valid under Florida law.

Following the District Court decision, however, Coastal filed suit in this court alleging that in building and maintaining the levee, the United States (1) prevented Coastal from mining limestone under and near the levee and (2) mined and used limestone from the bed of Lake Okeechobee, which limestone belonged to Coastal, all of which amounted to a Fifth Amendment taking of plaintiff's property—both the right to mine and the minerals themselves. Because the Fifth Circuit, as a result of the appeal by the state defendants in the District Court case, has before it the issue of the validity of Coastal's leases from 1964 to the present (including the period during which the levee was built), proceedings in this case were stayed awaiting decision on that issue. The Fifth Circuit has certified the question to the Florida Supreme Court, which appears unlikely to respond in the near future.

Defendant now contends, in its motion for summary judgment, that the case can be disposed of in its favor, without considering the validity of the lease under state law, on either of two grounds—that Coastal is collaterally estopped from asserting its ownership of unmined minerals by the unappealed decision in the District Court case or that any "taking" is non-compensable by reason of the navigation servitude. Coastal replies that, since the federal defendants were dismissed from the District Court suit for lack of jurisdiction, the doctrine of mutuality prevents the Government from now relying on the decision with respect to the scope of the lease in favor of the state defendants in that case.

Coastal also says that the Lake Okeechobee project was a flood control project, rather than an action in aid of navigation, that Congress recognized this, and that therefore the navigation servitude does not apply.

We need not now consider whether plaintiff is collaterally estopped by the District Court's ruling that under Florida law the lease gives it no compensable interest in the limestone in place because we are satisfied that, in any event, the United States can use that limestone, as it has, as part of the exercise of its navigation servitude.

 The latter privilege reserves to the Federal Government a dominant interest in all submerged property within navigable waters, below mean or ordinary high water mark. *United States v. Chicago, M., St. P. & P. R.R.,* 312 U.S. 592, 596–97, 61 S.Ct. 772, 85 L.Ed. 1064 (1941). This navigation servitude is an extremely old concept—owners of property or property rights within navigable waters take those rights fully cognizant of their limited nature. *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 808, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); *Gibson v. United States,* 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996 (1897). Plaintiff has admitted in answer to defendant's interrogatories that all the minerals about which it complains (in this part of its petition) were located below ordinary high water. Answers of Coastal Petroleum Co. to Interrogatories of Defendant ¶ 10. Coastal attempts, however, to take the case outside the navigation servitude by pointing out, as one of its points, that the limestone may not all have been taken "from the navigable waterway of the United States that runs through Lake Okeechobee." *Ibid.* The short answer to this contention is that "[t]he navigation easement is not limited to the thread of the stream where vessels pass, but extends from ordinary high water on one side to ordinary high water on the other." *Allen Gun Club v. United States,* 180 Ct.Cl. 423, 429 (1967). Where applicable, the servitude covers the whole of the water

found to be navigable, not merely the channel actually used.

■ The main argument for plaintiff is that the right of the United States to take or use such submerged property is limited to actions in aid of navigation, but that the work here was for flood control, rather than to aid navigation. The categories are not so distinct. In *Allen Gun Club v. United States, supra,* we held that flood control projects on the Mississippi and its source streams were also, because of the disastrous effects flooding has on navigation, projects in aid of navigation and that the navigation servitude therefore applied. 180 Ct.Cl. at 429–30; *see United States v. Twin City Power Co.,* 350 U.S. 222, 223–24, 76 S.Ct. 259, 100 L.Ed. 240 (1956); *United States v. Grand River Dam Authority,* 363 U.S. 229, 231–33, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960); *United States v. Commodore Park, Inc.,* 324 U.S. 386, 391–93, 65 S.Ct. 803, 89 L.Ed. 1017 (1945); *cf. Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.,* 313 U.S. 508, 525–26, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941). The statute under which many flood control undertakings, including the Central and Southern Florida Flood Control Project, are authorized states that the projects are "for the benefit of navigation and the control of destructive floodwaters and other purposes." Act of June 30, 1948, ch. 771, § 203, 62 Stat. 1175. Such a declaration has consistently been held conclusive to determine the navigation purpose of a project. *United States v. Grand River Dam Authority, supra,* 363 U.S. at 232, 80 S.Ct. 1134 and cases cited therein; *United States v. Twin City Power Co., supra,* at 224, 76 S.Ct. 259, and cases cited. Furthermore, the particular action which forms the basis of this suit, the construction of the Lake Okeechobee levee, was included in the project in large part because of the benefits it would provide for navigation on the Intracoastal Waterway, and this was one of the few parts of the project over which the Federal Government retained control after construction. H.R.

Doc. No. 643, 80th Cong., 2d Sess. 8, 36–37, 41, 49, 53 (1949). We hold, therefore, that the project involved here is entitled to the benefits of the navigation servitude.

■ Congress may, of course, decide in a particular case not to rely on the servitude, but rather to compensate owners of submerged land in navigable waters for actions which, like those to which the servitude is applicable, are grounded in the power of the Federal Government to regulate commerce. *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 739, 70 S.Ct. 955, 94 L.Ed. 1231, (1950); *F.P.C. v. Niagara Mohawk Power Corp.,* 347 U.S. 239, 254–56, 74 S.Ct. 487, 98 L.Ed. 686 (1954). But where a project has a legitimate navigation purpose, and there is no ascertainable Congressional intent to pay compensation, the presumption is that Congress intended to exercise both its navigation power and the navigation servitude. *United States v. Twin City Power Co., supra,* 350 U.S. at 225, 80 S.Ct. 1134; *United States v. Kansas City Life Ins. Co., supra,* 339 U.S. at 808, 70 S.Ct. 885 (decided the same day as *Gerlach* ); *United States v. Rands,* 389 U.S. 121, 122–24, 88 S.Ct. 625, 19 L.Ed.2d 329 (1967). That presumption is strengthened here by the proviso in the statute authorizing the project that "nothing herein shall impair or abridge the powers now existing in the Department of War with respect to navigable streams * * * " Act of June 22, 1936, ch. 688, § 3, 49 Stat. 1571; *see* Act of June 30, 1948, ch. 771, § 201, 62 Stat. 1175. We find nothing to persuade that Congress, despite its traditional right to use the submerged property without compensation, desired to make payment to the owners.

To say the navigation servitude applies to the Lake Okeechobee project needs, however, to be further refined. Coastal makes two distinguishable claims—one relating to its inability to mine under and near the levee and the other concerning the use of limestone mined by

the United States in building the levee. Once we have determined that the navigation servitude applies to this project, it is obvious that Coastal need not be compensated for loss of its right to take the stone under and near the levee. Such mining would in all probability have destroyed the levee either directly or by weakening the subsurface structure. Since any right to mine was subservient to the use of the property by the Federal Government in aid of navigation, the Corps of Engineers could, without compensation, preempt use of the lake bottom to support the levee rather than allow it to be used for mining.

While the application of the navigation servitude to limestone mined by the Government elsewhere than in the borrow pit for use in the levee is less clear,[6] we believe that the principle of *United States v. Commodore Park Inc.,* 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945), requires a decision for defendant. In that case, the United States, to provide better landing facilities for sea planes based at the Hampton Roads Naval Operating Base, dredged Willoughby Bay, a navigable waterway, to a depth of 10 to 15 feet below mean low water. The dredged material was used to enlarge the shore facilities of the Base by placement at the mouth of Mason Creek, thereby destroying the navigability of that water. *Ibid.* at 389, 65 S.Ct. 803. Commodore Park owned fastlands on Mason Creek, and sued for a taking of that part of the value of its land which was based on its fronting on a navigable waterway. *Ibid.* at 387–88, 65 S.Ct. 803. The District Court found that neither the dredging nor the filling of Mason Creek had any relation to navigation, and granted compensation. The Fourth Circuit Court of Appeals affirmed, holding that while the dredging was related to navigation, the fill, which had caused the damage, was not. *Ibid.* at 388, 391, 65 S.Ct. 803. The Supreme Court reversed on two main grounds.

First, the Court found that there was no property interest owned by Commodore Park in the flow of Mason Creek, a finding which is irrelevant to this case as we now decide it. The Court then went on to find that the filling of Mason Creek was covered by the navigation servitude even though it impeded, rather than aided, navigation, and even though the project was on a distinct, though connected, body of water from the Bay where dredging in aid of navigation occurred. *Ibid.* at 392–93, 65 S.Ct. 803. It was the total project, not individual pieces of it which Congress, through the War Department, had determined to be in aid of navigation—and that judgment, invoking the navigation servitude, was not to be disturbed. *Ibid.* at 392, 65 S.Ct. 803.

We think the same reasoning is applicable here. The Lake Okeechobee project must be considered as authorized as a whole, for construction as found proper by the Corps of Engineers. When the Corps decided (if it did, *see* note 6 *supra*) to use limestone found be-

---

**6.** Defendant's position is murky as to whether limestone from outside the borrow pit was used in constructing the levee. In its answer to Coastal's petition, defendant appeared to admit that substantial quantities of limestone from the lake bed were used in the construction. Answer ¶ 9; *see* Answer to First Amended Petition ¶ 9. On the other hand, in its latest submission, the affidavit of Construction Branch Chief C. W. Pritchett, defendant seems to imply that the only limestone taken from the lake bed was taken when the borrow pit, because of the irregularity of the lake shore, entered the lake. Affidavit of C. W. Pritchett ¶¶ 4, 5; Note 1 to Map entitled Levee 47–Section 1, Plan and Sections, submitted with affidavit. If this later explanation is correct, the servitude would clearly bar recovery since the borrow pit was an integral part of the levee and water control system. However, given the requirement that we view the facts most favorably to plaintiff on defendant's motion for summary judgment, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), and the uncertainty of defendant's response, we have considered the case on the assumption that limestone was quarried from the middle of the lake, outside of the immediate construction area.

low ordinary high water within the navigable waters in order to build the levee, there was "not an invasion of any private property right in such lands for which the United States must make compensation. The damage sustained resulted not from a taking of the * * owner's property in the stream bed, but from the lawful exercise of a power to which that property has always been subject." *United States v. Chicago, M., St. P. & P. R.R., supra,* 312 U.S. at 597, 61 S.Ct. 772. So long as the limestone was employed for the levee project—which was itself plainly covered by the navigation servitude—that use of submerged minerals below the high water mark of the very same navigable water was authorized as part of and directly incident to the main work. No payment had to be made. "[T]he Congress, and those to whom it has delegated authority, may, without Fifth Amendment liability, employ land submerged under navigable water in the way that in their best judgment helps to accomplish the overall purpose even if, intentionally or not, they impair navigation for some purposes in some areas." *Allen Gun Club v. United States, supra,* 180 Ct.Cl. at 430. That the United States might have received some commercial, rather than military (as in *Commodore Park, supra* ), benefit from use of the limestone does not reduce the extent of the dominant interest. *See United States v. Rands, supra; United States v. Twin City Power Co., supra.*

The defendant's motion for summary judgment is granted [7] and Count I of the petition is dismissed. The case is remanded to the trial division for appropriate proceedings on Count II.

---

7. Plaintiff has challenged the appropriateness of summary judgment, contending that there should be a trial to ascertain the purposes and scope of the Lake Okeechobee project, as well as of the circumstances surrounding the Government's use of the limestone. We think, however, that there is ample basis for our determination in the affidavit and documents supplied by the parties and in the legal materials relating to the project of which we can properly take judicial notice. Plaintiff does not present enough to raise any factual issue which should be tried.