**LAMBERT GRAVEL COMPANY, INC., Plaintiff-Appellant,**

v.

**J.A. JONES CONSTRUCTION COMPANY, et al., Defendants-Appellees.**

**No. 87-4008.**

United States Court of Appeals, Fifth Circuit.

Jan. 7, 1988.

Rehearing Denied Feb. 8, 1988.

---

W.P. Wray, Jr., Robert M. Brian, Wray, Robinson & Kracht, Baton Rouge, La., for plaintiff-appellant.

Charles F. Seemann, Jr., Brian W. Erikson, Deustch, Kerrigan & Stiles, New Orleans, La., for defendants-appellees.

Before WISDOM, GEE and KING[*], Circuit Judges.

CAROLYN DINEEN KING, Circuit Judge:

Lambert Gravel Company, Inc. appeals from the district court's grant of J.A. Jones Construction Company's motion for partial summary judgment on Lambert's claims for an equitable price adjustment and additional costs incurred during the performance of its contract to provide sand and fine concrete aggregate to Jones. Finding no error in the district court's decision, we affirm.

## I.

In December of 1979, J.A. Jones Construction Company ("Jones"), a general contractor, entered into an agreement ("Prime Contract") with the United States Army Corps of Engineers ("Corps") to construct a portion of "the elaborate and massive lock and dam improvements on the Red River" in the southern tip of Catahoula Parish, Louisiana ("the Project"). The Project involved the construction of (1) a channel and lock across the neck of an oxbow loop in the river to shorten the river's course for navigation ("Construction Project") and (2) an earthen dam ("Closure Dam") at the upper end of the oxbow loop to close the loop and divert the river through the new channel and lock. In the Prime Contract, Jones was required to backfill the lock structure with a specified

---

[*] Formerly Carolyn Dineen Randall.

quantity of "select sand."[1] In July of 1980, Lambert Gravel Company, Inc. ("Lambert") signed a purchase order contract with Jones ("Lambert Contract") in which it agreed to supply select sand and fine concrete aggregate for the Construction Project.[2] The Lambert Contract incorporated by reference all the provisions, specifications, maps, and drawings of the Prime Contract.

The Prime Contract also required Jones to provide sand fill for the Closure Dam after the lock was built. The fill material for the Closure Dam was specified to be "a sandy material from the existing streambed as shown on the drawings and as directed by the Contracting Officer." On the left descending bank of the river in the upper end of the oxbow loop there was a large sand bar ("Disputed Bar") which was shown on the appropriate plan sheets as blocked by a right-of-way line and captioned "Borrow Area for Closure Dam (sand fill)." The Disputed Bar lay below the high water mark of the river. Lambert was aware of the legend printed over the Disputed Bar on the plan sheets.

To fulfill its obligation to provide fill materials, Lambert entered into a surface lease agreement with Louisiana Delta Plan- tation ("Delta"), the owner of the land riparian to the Disputed Bar. Under the lease agreement, Delta granted Lambert the right to extract sand from the Disputed Bar. Lambert began extracting that sand in August of 1980. Lambert's activities did not go unnoticed and, on May 12, 1981, the Corps notified Jones by letter that Lambert was extracting sand from a reserved "borrow area." The letter stated that "[i]n accordance with [the] drawings, the material in this borrow area is to be used for the Closure Dam. Contrary to the drawings you and your supplier are using this material for something other than the Closure Dam."[3] The letter ended by commanding Jones and its "supplier" to cease operations in the area immediately. Jones' project manager wrote Lambert immediately and directed Lambert to stop removing sand from the Disputed Bar and seek suitable materials elsewhere.[4] Lambert was also furnished with a copy of the Corps' letter. A few days later, Lambert acknowledged receipt of the order directing it to stop removing sand from the Disputed Bar. In its acknowledgement letter to Jones, Lambert protested the order and promised to take legal action against Jones for its "breach of contract." While Lambert

1. The Prime Contract specifications defined select sand. Moreover, the specifications stressed that "[s]and from the existing streambed may not meet these requirements without processing and may have to be obtained from offsite sources both at the contractor's expense."

2. The Lambert Contract was prepared and dated by Jones on May 12, 1980. Lambert accepted and signed the agreement on July 3, 1980.

3. The letter went on to outline the Corps' initial objection to Lambert's agreement with Delta. The letter stated that the Disputed Bar belonged to Louisiana and not to Delta and had been given to the federal government for a specific use—the Closure Dam. Neither party disputes the fact that the Corps' reasoning in this letter was incorrect. The navigational servitude served as the basis of the Corps' objection to Lambert's extraction of sand from the Disputed Bar. We agree with the district court, however, that "[t]he Corps' error ... does not preclude the government from asserting the naviga- tion[al] servitude." Had Lambert pursued its suit against the Corps at the time of the eviction, the correct legal argument would have been asserted by the Corps. In the instant case, we are only concerned with the Corps' ultimate right to evict Lambert from the Disputed Bar.

4. The letter read as follows:

Reference is made to recent phone conversations with your Mr. Bamber relative to your dredging operation on the Red River near the Lock and Dam # 1 site. When you first discussed the possibility of taking sand from the bars on the Red River, Mr. Ligon gave you contract drawings showing the Corps of Engineer's designated borrow area. At this time you were told that the material inside the boundaries delineated on contract drawing 3/1 could not be used since it was designated as fill for the upstream closure dam. It has recently come to my attention that your dredge has crossed over the boundary lines into the designated borrow area. The material that you are dredging has been obtained by the Corps of Engineers for a specific use. You do not have nor have you requested permission from the government or J.A. Jones to remove this material. We have no alternative but to direct you to stop removing this sand immediately and seek suitable material from other sources.

agreed to abide by the order, it reserved all legal rights and claims it might have against Jones and stressed its exclusive rights to the sand from the Disputed Bar. That same day, Lambert wrote a similar letter of protest to the Corps. By a letter dated May 29, 1981, Jones offered to "make available to [Lambert] all of the contract rights that exist in [the Prime Contract] to dispute this directive and to file a claim for additional compensation." Lambert declined this invitation to seek legal recourse against the Corps through Jones as prime contractor.

Cognizant of the fact that no further materials would be accepted from the Disputed Bar, Lambert sought and eventually secured an alternate source of materials, approximately seven miles further away. Prior to securing this alternate excavation site, Lambert was forced to procure an interim source of materials, some thirty miles further away, from which to satisfy its obligations under the Lambert Contract. Upon completion of operations, Lambert calculated its additional costs and expenses occasioned by its ouster from the Disputed Bar and served "notice of its damages" on Jones. Lambert claimed to have incurred additional costs in the amount of $2,153,-148.00.

Pursuant to the Miller Act,[5] Lambert filed a civil action in the United States District Court for the Western District of Louisiana against Jones and its six sureties.[6] Lambert subsequently filed its "Amended and Supplemental Complaint" on January 17, 1985. As summarized by the district court, Lambert presented four claims: (1) a claim for the payment of six unpaid invoices, in the sum of $7,625.81, representing materials delivered to Jones which were not paid for ("invoice claim"); (2) a claim for payment of the retainage balance, amounting to $20,812.50, representing a percentage of the price of materials delivered to Jones ("retainage claim");

(3) a claim for alleged increased costs of materials delivered to Jones, including increased production costs amounting to $720,328.00 and additional equipment costs of $1,432,820.00, all totalling $2,153,148.00 ("increased costs claim"); and (4) a claim for payment of the unit contract price under Lambert's lease agreement with Louisiana Delta Plantation for sand allegedly removed from the sand bar by Jones' subcontractor after Lambert was ordered to cease mining operations on the sand bar, which claim amounted to $6,210,000.00 ("unit price claim").

On September 24, 1985, Jones filed a motion for summary judgment. Lambert responded with its own motion for summary judgment on October 28, 1985. The district court held a hearing on the parties' motions on February 3, 1986. During the hearing, Lambert's counsel correctly pointed out that the invoice and retainage claims would not be affected by either motion. Therefore, the district court treated the motions as ones for partial summary judgment. On April 3, 1986, the district court entered a judgment granting Jones' motion for partial summary judgment. The district court concluded that since the Disputed Bar lay below the high water mark of the river, it was subject to the federal navigational servitude. The district court found that Congress neither intended to forego the servitude completely with respect to the Project, nor authorized the Corps to waive the servitude. Therefore, the Corps had the right in the instant case to bar Lambert from extracting sand from the Disputed Bar. Since Lambert had no right to remove the sand from the Disputed Bar in order to fulfill its contractual obligations to Jones, the district court reasoned, "Jones [could not] be held liable for damages suffered by Lambert as a result of the Government exercising the navigation[al] servitude." In conjunction with its ruling, the court expressly noted that the

---

**5.** 40 U.S.C. §§ 270a *et seq.*

**6.** Jones' sureties, as listed in Lambert's complaint, were Aetna Casualty and Surety Company, the Travelers Indemnity Company, Stanford Fire Insurance Company, Lumberman's Mutual

Casualty Company, Employer's Reinsurance Corporation, and North American Reinsurance Corporation. The sureties are parties to the instant appeal and will be identified collectively with Jones.

retainage and invoice claims remained unaffected.

On August 5, 1986, the district court entered an "Order of Dismissal." Under the order, the district court, "having been orally advised by counsel for the parties that this matter has been settled," dismissed "this action" without prejudice to the right, upon a showing of good cause within sixty days, to reopen it if settlement was not consummated. On December 3, 1986, the parties entered into a "Stipulation of Partial Compromise Agreement." Under this agreement, the parties sought to settle only the invoice and retainage claims. They explicitly reserved all their rights, including but not limited to the right of appeal, as to the other claims which were dismissed by the district court's April 3 interlocutory judgment. On December 4, 1986, the district court entered its "Partial Judgment of Dismissal." In that order, the district court, pursuant to Federal Rule of Civil Procedure 54(b), and after considering the parties' compromise agreement, dismissed the invoice and retainage claims. Lambert timely filed notice of appeal from the April 3 grant of partial summary judgment which became a final judgment, since the remaining claims were dismissed pursuant to the settlement arrangement.

## II.

On appeal, Lambert argues that: (1) the district court erred by holding that neither Congress nor the Corps had manifested an intent to relinquish the navigational servitude with respect to the Project; (2) the Corps did in fact consent to an encroachment on the navigational servitude in the instant case; (3) even if the navigational servitude would otherwise apply here to an action between the government and a riparian owner, the district court erred in allowing Jones to assert the servitude as a defense to Lambert's contractual claims against it; and (4) since there was enough fill material on the Disputed Bar to supply both Jones' and Lambert's needs for the Project, the district court erred by granting summary judgment because a material issue of fact remained as to whether the Corps intended to exclude all dredging activity on the Disputed Bar except for sand needed to fill the Closure Dam.

## III.

At the outset, we must identify the applicable standard of review. "When an appeal is taken from a summary judgment, we review the record under the same standards the trial court applied to determine that summary judgment was appropriate." *Wilson v. United States Fidelity & Guar. Ins. Co.*, 830 F.2d 588, 590 (5th Cir.1987) (citing *Reid v. State Farm Mui. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986)). Therefore, we must determine whether the record demonstrates that "there is no genuine issue as to any material fact" and that Jones is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985).

The district court analyzed the instant case within the framework of the government's right to assert its navigational servitude over the Disputed Bar. The navigational servitude is a dominant servitude which extends to all lands below the ordinary high water mark of a navigable river. *United States v. Cherokee Nation of Oklahoma*, — U.S. —, 107 S.Ct. 1487, 1490, 94 L.Ed.2d 704 (1987). As the Supreme Court noted in *Cherokee Nation:*

> The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject.

*Id.* (quoting *United States v. Rands*, 389 U.S. 121, 122, 88 S.Ct. 265, 266, 19 L.Ed.2d 329 (1967)). The Disputed Bar is in the bed of the Red River below the ordinary high water mark. It is clear, therefore, that the Disputed Bar is susceptible to being burdened by the navigational servitude. Lambert argues, however, that Congress "manifested a definite intent to surrender the

federal navigational servitude" on the Project. Moreover, Lambert contends that Congress authorized the Corps to consent, and the Corps did so consent, to an encroachment upon the navigational servitude in this case. We turn now to the merits of these preliminary arguments.

■ It is clear that Congress may decide, in a particular case, not to assert the navigational servitude, "but rather to compensate owners of submerged land in navigable waters for actions which, like those to which the servitude is applicable, are grounded in the power of the Federal Government to regulate commerce." *Coastal Petroleum Co. v. United States*, 524 F.2d 1206, 1210, 207 Ct.Cl. 701 (1975) (citing *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 739, 70 S.Ct. 955, 962, 94 L.Ed. 1231 (1950) and *Federal Power Commission v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 254, 256, 74 S.Ct. 487, 496, 497, 98 L.Ed. 666 (1954)). It is equally clear that "such a waiver of sovereign authority will not be implied, but instead must be 'surrendered in unmistakeable terms.'" *Cherokee Nation*, 107 S.Ct. at 1492 (quoting *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 2397, 91 L.Ed. 2d 35 (1986)).

■ After a thorough and thoughtful treatment of the question, the district court concluded that Congress had failed to evince a clear intent to forego the navigational servitude with respect to the Project. The district court found that while the statutory language relied upon by Lambert "recognizes the 'interest and rights' of states in determining the development of watersheds and in water utilization and control," none of the language presented constituted a congressional waiver of the

navigational servitude. We find no error in the district court's well-reasoned conclusion on this point. As the district court noted, however, Congress need not completely renounce the navigational servitude; rather, it may authorize the Corps to waive it in certain cases. *See United States v. 119.67 Acres of Land, More or Less, Situated in Plaquemines Parish, State of Louisiana, et al.*, 663 F.2d 1328, 1335–37 (5th Cir. 1981); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 610 (3d Cir.1979). With respect to the Project, the district court concluded that "Congress did not delegate to the Corps the authority to consent to encroachments on the federal navigation[al] servitude." We see no need to decide this question, for even if the Corps had the authority to waive the navigational servitude, the record clearly fails to demonstrate that it did so.

Initially, Lambert asserts that the Corps waived the navigational servitude in its dealings with Delta. The lands and easements necessary to the Project were acquired by the Red River Waterway Commission ("the Commission"), a local authority.[7] Delta participated in extensive negotiations with the Commission and the Corps before conveying the lands necessary for the Project to the Commission. Concerned about losing more lands if the oxbow lake created by the Project were developed for recreational use, Delta, according to Lambert, "sought to reserve certain property (including the disputed sand bar) from the ... sale."[8] The Corps responded that recreational plans were not firm but that any development would occur on the opposite bank of the river, if at all. The response noted, however, that a 50 to 200 foot "buffer zone" would be required on Delta's side of the river.[9] The Corps' re-

7. The Project was a "local cooperation project." Under the federal legislation authorizing the Project, the local governing authority—here, the Commission—was charged with acquiring all the land, easements and rights-of-way required for the construction of the Project. Any property so acquired, however, was to be subsequently conveyed to the United States.

8. Among other conditions to the proposed sale, Delta sought assurance "that the remaining

lands south of the proposed Lock and Dam cut-off remain the property of Louisiana Delta Plantation and will not be taken by expropriation at a later date."

9. The relevant portion of the response reads:
Recreational plans are not firm, although we do foresee development of the oxbow lake as a recreational feature of the project. Development would, however, be located on lands on the opposite bank of the river, with the excep-

sponse cannot be regarded as an agreement not to take more property. Moreover, given the requirement that any waiver of the navigational servitude be made in unmistakeable terms, the Corps' response can in no way be construed as a waiver of that "sovereign authority." *See Cherokee Nation,* 107 S.Ct. at 1492 (quoting *Bowen,* 106 S.Ct. at 2397).

■ Lambert next contends that because the Corps purchased some other tracts of land lying between the mean low water mark and the ordinary high water line (and therefore subject to the navigational servitude), they had consented to an encroachment on the navigational servitude. These acquisitions, however, were part of larger tracts of land and were contained in deed descriptions. It would be most unusual for the Corps to purchase such a tract of land only so far as the ordinary high water line. In that unlikely instance, the prior owner of the tract would still own the narrow strip of land between the mean low water mark and the ordinary high water line. That strip, of course, would still be subject to the navigational servitude. The acquisition of land subject to the servitude as a part of the purchase of a larger tract, therefore, would seem more a measure of convenience than a waiver of the navigational servitude. In any event, these deeds, having nothing to do with the Corps' exercise of the navigational servitude over the Disputed Bar, are inapposite to the instant case. Therefore, we remain unpersuaded by Lambert's claims that the Corps relinquished the navigational servitude in the instant case.

■ Lambert next argues that the district court erred by allowing Jones "to wield the [navigational] servitude as a contract claim defense." Lambert asserts that while "owners of submerged lands within navigable waters take their rights cognizant of the dominant servitude ... it would be novel for this Court to hold that the

agreements of contracting parties are subject to unilateral amendment by imposition of the same servitude." With this argument, Lambert attempts to evade the navigational servitude by imposing a different analytical framework on the problem: Lambert argues that the navigational servitude only applies to cases involving the fifth amendment takings clause. Since the instant case is purely one of contract, therefore, the navigational servitude is irrelevant. Lambert had a valid lease to excavate sand from the Disputed Bar and Jones' wrongful eviction of Lambert from the sandbar occasioned the incurrence of additional costs in the performance of the contract.

Lambert's argument, however, ignores the fact that Lambert's suit rests solely upon the alleged wrongful eviction. It cannot arise from the Lambert Contract since that agreement was silent as to where Lambert would obtain sand. Lambert fails to even contend that its original bid for the Lambert Contract was calculated on the basis of its use of sand from the Disputed Bar. In fact, any such contention would be inherently suspect given Lambert's admitted awareness of the area's designation as a "Borrow Area for Closure Dam." Lambert cannot escape the navigational servitude by arguing its inapplicability between two private parties on a contract claim since its right to extract sand from the Disputed Bar arises solely from its lease with Delta. Lambert's assertion that the eviction was wrongful, therefore, is dependent upon the legal ramifications of its lease with Delta. If Delta could not complain of the Corps' use of the sandbar due to the exercise of the navigational servitude, then neither could Lambert. The lessee takes the lease subject to the same dominant servitude as the lessor. *See Cherokee Nation,* 107 S.Ct. at 1490 n. 3 ("the navigational servitude is dominant to riverbed interests no matter how acquired"). We refuse to hold that Delta

tion that a visual esthetic [sic] barrier (buffer zone) would be required on the severed side. This barrier would be in the form of vegetation, and its width might vary from 50 feet to 200 feet from the ordinary high water line, depending upon the terrain. Certain uses would be permissible within the defined

width of the visual barrier, provided that they were consistent with the existence of the oxbow lake as a natural area (inclosure 2). Further, some provision might be necessary to insure that undesirable effluent does not enter the oxbow lake.

and Lambert could avoid the navigational servitude merely by executing a lease. Those acquiring rights in property subject to the navigational servitude take those rights fully cognizant of their limited nature. *Coastal Petroleum*, 524 F.2d at 1209.

■ Lambert also maintains that its eviction by the Corps was unreasonable in that "[i]t has never been the sovereign's province to exclude uses of land burdened by the navigational servitude which are compatible with the government's use."[10] Even if we accept this position as fact, we are unable to agree that the Corps' exercise of the navigational servitude in the instant case was unreasonable. First, Lambert never asserted this "fact" until after it fulfilled the Lambert Contract with materials from other excavation sites. Therefore, Lambert's assertion involves an exercise of hindsight unavailable to the Corps at the time of the eviction. If it had accepted Jones' invitation to seek recourse against the Corps in 1981, Lambert might have brought this fact to the Corps' attention

and rendered nugatory the need for further litigation. It chose not to do so and cannot be allowed to profit from that decision. Moreover, the Corps' right to the Disputed Bar included the right to the top sand, the easiest and most economical to remove. Jones also points to other concerns of the Corps, including the ecological ramifications of more extensive excavation and the potential tort liability inherent in leaving an "abnormal hole" in an area intended for water recreation. Thus, we are unprepared to accept the validity of Lambert's assertions on this point.

As demonstrated earlier, the Corps was justified in utilizing the navigational servitude to bar Lambert from extracting sand from the Disputed Bar. Lambert's "right" to excavate sand from the Disputed Bar was subservient to the Corps' use of the site for the Closure Dam.[11] As the district court concluded, "Lambert had no right to remove sand from the Delta sandbar in order to fulfill its contractual obligation to Jones." Jones, acting at the Corps' behest, was entitled to reject further deliveries of

10. The district court found that "[t]he facts are disputed as to whether the Corps, by designating the borrow area for channel closure material, intended to exclude all other extracting activities not related to the channel closure dam operation." The district court went on to conclude, however, that the resolution of this factual dispute was not material to its holding. We agree. Lambert failed to bring this "fact" to the Corps' attention prior to its completion of the Lambert Contract with alternate materials. Moreover, given that sand from the Disputed Bar was not an element of Lambert's original bid calculations, the question of whether or not Lambert was justified in believing that the plan designation did not mean to exclude Lambert's use is immaterial in the instant case. Finally, even if the Corps did not originally mean to exclude all other excavation by the plan designation, it may still have been justified in objecting to Lambert's use. Specifically, the Corps may well have objected to Lambert's excavation of sand for the Construction Project before the needs of the Closure Dam were met. Therefore, the factual dispute is not material to the resolution of the instant case and cannot serve to preclude the entry of summary judgment. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Only disputes over facts which might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment.").

11. Given the circumstances of this case, Lambert's reliance on *United States v. Kaiser Aetna*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), would seem clearly misplaced. In *Kaiser Aetna*, a private developer sought to construct a marina on Kapua Pond, an underdeveloped privately owned body of water in Hawaii separated from navigable water by a barrier beach. The pond's maximum depth at high tide was two feet. Kaiser Aetna leased the pond for the development of the marina and notified the Corps of its plans. The Corps advised Kaiser Aetna that no permits were required for the development of its operations in Kapua Pond. Millions of dollars were invested to convert Kapua Pond into a navigable private marina maintained with fees paid by users of the marina. Years later, the Corps attempted to invoke the navigational servitude in order to require the owners to grant the public a right of access to the marina. The Supreme Court disagreed with the Corps' position and wrote:

[W]hat petitioners now have is a body of water that was private property under Hawaiian law, linked to navigable water by a channel dredged by them with the consent of the Government. While the consent of individual officials representing the United States cannot "estop" the United States, it can lead to the fruition of a number of expectancies embodied in the concept of "property" —expectancies that, if sufficiently important, the Government must condemn and pay for

sand from the Disputed Bar as material from an unsuitable source. Jones, therefore, cannot be held liable for the Corps' proper exercise of the navigational servitude. Moreover, since Lambert did not rely on sand from the Disputed Bar in its original bid, Lambert could not sustain any equitable arguments militating in favor of an adjustment in contract prices. The district court, therefore, did not err in granting Jones' motion for partial summary judgment.

## IV.

For the foregoing reasons, the judgment is AFFIRMED.

before it takes over the management of the land-owners property.
*Kaiser Aetna,* 444 U.S. at 179, 100 S.Ct. at 383 (citation omitted). Lambert contends that its situation is analogous to that of the property owner in *Kaiser Aetna.* We disagree. In the instant case, the Corps never explicitly consented to Lambert's lease agreement with Delta. Moreover, as noted earlier, the Corps' response to Delta's request for assurances could not be construed as a waiver of rights to the Disputed Bar. Lambert had no "expectancies" in the Disputed Bar—a piece of land expressly devoted to sand for the Closure Dam. Since any right to extract sand was subservient to the use of the property in aid of navigation, the Corps could, without compensation, preempt Lambert's use of the Disputed Bar in order to provide sand for the Closure Dam. *See, e.g., Coastal Petroleum,* 524 F.2d at 1211–12.