Dear Sirs:
This is in response to your requests for an opinion of this office concerning the question of whether Gassoway Lake is publicly or privately owned and whether the public has a right of use or access to the lake through and across a publicly constructed and maintained roadway now blocked by private interests.
Upon receiving your initial request, we contacted both the State Land Office and the U.S. Army Corps of Engineers, Vicksburg District, and have obtained information, records and data from those two offices relevant to the questions presented. We have also reviewed records from the Offices of the Assessor and the Clerk of Court for East Carroll Parish, Louisiana, pertaining to this matter.
As a part of our inquiry, we have also reviewed U.S. Army Corps of Engineers permits and permitting information, correspondence, quadrangle maps, hydrological surveys, the original township surveys available at the State Land Office, as well as Tobin maps, the Fisk maps, the title report of the State Land Office, and other related materials.
BRIEF HISTORY -
Gassoway Lake has been used by the public at large since its formation and, until recent times, there has been no restriction to public usage. Moreover, it can be documented that from at least the early 1950's through the late 1970's and possibly into the 1980's, the access road from State Highway 65 was constructed, maintained and improved by the Police Jury through the use of Police Jury personnel, road graders and other equipment to the water's edge at Gassoway Lake, where a public boat ramp was maintained. Local accounts describe similar activity by the Police Jury for a period of more than forty (40) years. The boat launch located on Gassoway Lake was also constructed, improved and maintained by the Police Jury using its dragline and Police Jury personnel. Therefore, ingress and egress to the lake was provided at public expense for many years. At some point in time believed to be the early 1980's, a fence was built across the publicly maintained roadway to the lake, and it apparently remains in place at this time, obstructing public access to the waters of the lake. This obstruction was made by private interests without authority of the Police Jury, and is therefore contrary to law, particularly as it blocks a highway of commerce, La. R.S. 14:96 and 14:97, and obstructs a public passage, La. R.S. 14:100.1 and La. R.S. 48:512, discussed below.
Gassoway Lake is located in Township 23 North, Range 12 East in East Carroll Parish, Louisiana, and formerly was the location of the active channel of the Mississippi River. Shortly after state sovereignty in 1812, the main channel of the river flowed to the east of the subject location, as shown by the 1826, 1827 and 1829 meander lines. Thereafter, the river moved to the west and occupied the present location of Gassoway Lake. Subsequently, as shown by historical documents, this active meander bend became over extended or too large to efficiently carry the flow of the river, resulting in a neck cutoff to the east of the present location of Gassoway Lake in approximately 1830.[1]
Thereby, the main downstream course of navigation of the Mississippi River abandoned its bed and bottom to the west, moving abruptly and avulsively to the east where it established a shorter and straighter alignment with greater efficiency to carry the main body of the river.[2] While the old bendway, known as Gassoway Lake, continued to wain in its ability to function as a main river course, it continued in an active capacity at high stages of the river and continued to support a transport bed load for many years. Even now, Gassoway Lake is overflowed at high stages and the current of the river flows to some extent through the area of dispute.
As a consequence, the U.S. Army Corps of Engineers has declared these waters to be navigable waters of the United States and has exercised its regulatory jurisdiction over such waters without interruption. Currently, the U.S. Army Corps of Engineers, Vicksburg District, is actively involved in the regulation of the waters of Gassoway Lake, having found them to support both recreational and commercial fishing, and has permitted a water control structure to be constructed for limited periods. The Corps allows non-exclusive use of the waters of Gassoway Lake by both private interests and the public at large.
It should be noted that there is some inconsistency in mapping and historical documents pertaining to this reach of the river which is rather typical of matters of this type due to the remoteness of the area at earlier times in history, the lack of means of technical evaluation during pertinent periods of time, the absence of well documented historical events, inaccurate mapping and/or the reliance upon base maps outdated by the passage of time and events, and failure to analyze available materials, such as vicinity maps, engineering maps and studies, river surveys and matters of the like.
In this regard, government records show that the farm lands at the present location of Gassoway Lake were transferred by U.S. Patent to private persons between 1839 and 1841, meaning that an application for such transfer was filed prior in time and not actually issued until 1839, by which time (1830) the Mississippi River had occupied a portion of the subject lands and then moved east, making them a part of the bed and body of the main downstream course of the river about the time of patent application. Thus, it may be said with some certainty that at least a portion of the lands which were the subject of the patent were not in existence during the patent process, not an unusual occurrence along the Mississippi River,[3] but sprang into existence through re-emergence thereafter.[4]
By 1881, the river had once again moved to the west and fully occupied the entirety of what is now known as Gassoway Lake, scouring a deep bed, had it not existed earlier. By 1937, the river meandered to the east again, leaving once again the abandoned bendway which became known as Gassoway Lake. The rapidity of this last change has not been studied in enough detail to determine whether the move was avulsive or not, thus leaving open the question of whether the Louisiana-Mississippi boundary may have been established at the center of the downstream track of navigation as of about 1881, making the east side of the lake Mississippi territory and the west side within Louisiana[5]. Various quadrangle maps depict an interstate boundary further to the east and related to Bunch's Cut-Off, probably the work of cartographers and draftsman rather than the judiciary.
The events involving the present controversy suggest an analysis into several different legal issues involving public versus private ownership, public rights of use and access, public navigational rights under state and federal law and the exercise of state and federal regulatory jurisdiction. These issues are complex and would require significant efforts to be fully resolved in all of their various aspects. However, it is not necessary to fully determine ownership, which might also involve the validity of the original U.S. Patent[6], in order to reach a determination as to the rights of the public to have access to use and navigate the waters of Gassoway Lake.
It will be noted that the Louisiana Civil Code does make provision for the owners of land on which the new bed of a river may come to be located in order for them to be able to claim by way of indemnification the old abandoned bed, in proportion to the quantity of land lost by that owner. Thus, in the event the successors in interest to the original patentees could establish the validity of their title, subsequently lost by the westward migration of the Mississippi River to the area of the dispute, they may well claim a right to indemnification for their lands taken by the river pursuant to Civil Code Article 504, which states:
 When a navigable river or stream abandons its bed and opens a new one, the owners of the land on which the new bed is located shall take by way of indemnification the abandoned bed, each in proportion to the quantity of land that he lost. If the river returns to the old bed, each shall take his former land.
The Louisiana courts have dealt with situations of this type in a number of cases, including, most recently, State ofLouisiana v. Bourdon, 535 So.2d 1091 (La.App. 2d Cir. 1988), writ denied, 536 So.2d 1223; Verzwyvelt v.Armstrong-Ratterree, Inc., 463 So.2d 979 (La.App. 3d Cir. 1985). While the facts in those cases were quite different and inapposite to those now under consideration, the legal analysis is most instructive.
NAVIGABILITY
Based upon our review of a substantial body of information, referred to partially above, we have concluded that Gassoway Lake as it presently exists is indeed a navigable body of water which is occupied annually, to a greater or lesser extent, by the waters of the Mississippi River. In periods of high water to extreme high water, water elevations in Gassoway Lake are significantly affected by the waters of the Mississippi, a current is established and there is open communication with the active main channel of the river. Clearly, these waters are capable of and do actually support navigation for purposes such as hunting, fishing, trapping and for limited commercial purposes, as well as recreational purposes. The U.S. Army Corps of Engineers has made these same findings in its regulation of Gassoway Lake.
NAVIGABILITY UNDER STATE LAW -
Under state law, a body of water is navigable in law when it is navigable in fact. See State v. Jefferson Island Salt MiningCo., 183 La. 304, 163 So. 145 (1935) cert. den. 297 U.S. 729,56 S.Ct. 667, 80 L.Ed. 1001; State v. Sweet LakeLand Oil Co., 164 La. 240, 113 So. 833 (1927); DeltaDuck Club v. Barrios, 135 La. 357, 650 So. 489
(1914); Ramsey River Road Property OwnersAssociation, Inc. v. Charles E. Reeves, et al., 396 So.2d 873
(La. 1981). The factual question turns on whether the evidence shows a body of water to be suitable by its depth, width and location for commerce, as it does in this instance, whether so actually used or not. Burns v. Crescent Rod Gun Club, 116 La. 1038, 41 So. 249 (1906). See also,State of Louisiana, ex rel William J. Guste, Jr.,Attorney General v. Two O'Clock Bayou Land Co.,Inc., 365 So.2d 1174 (3rd Cir. 1978), writ refused, 1979, in which the 3rd Circuit Court of Appeal reaffirmed the jurisprudence of this State, cited above, that "a body of water is navigable in law when it is navigable in fact.", at page 1177. The court further upheld the right of the State to obtain an injunction from obstruction of the waterbody under such circumstances, citing the Louisiana Criminal Code, La. R.S. 14:96
and 14:97, and Civil Code Article 450.
NAVIGABILITY UNDER FEDERAL LAW —
Under federal law, the rule of "navigability" dates back toThe Daniel Ball, 77 U.S. (10 Wall.) 557,19 L.Ed. 999 (1871) in which the United States Supreme Court held that navigable in law means navigable in fact: "Rivers are navigable `when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in customary modes of trade and travel on water.'" Loving v. Alexander,745 F.2d 861, 864 (4th Cir. 1984) (quoting The DanielBall, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871)).See also, United States v. Appalachian Electric PowerCo., 311 U.S. 377, 406 N. 21, 61 S.Ct. 291, 298 N. 21,85 L.Ed. 243 (1940).
This rule of navigability applies both to rivers and all other water courses. See Utah v. United States, 403 U.S. 9,10-11, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971).
The navigational servitude is a dominant federal easement which attaches to the exercise of power of the government to control and regulate navigable waters in the interest of commerce, and it expresses the notion that the right of public use to a waterway supersedes any claim of private ownership. There is no need for navigation to be open at all seasons of the year, or at all stages of the water for a body of water to be found to be navigable. Rivers and Harbors Appropriation Act of 1899, § 9 et seq., 33 U.S.C.A., § 401 et seq.; Loving v.Alexander, 548 F. Supp. 1079 (1982); Goodman v. City ofCrystal River, 669 F. Supp. 394 (1987); LambertGravel Company, Inc. v. Jones Construction Company,835 F.2d 1105 (5th Cir. 1988).
The federal courts have also held that a waterway is never again capable of private ownership once it has been held to be navigable, stating that "When once found to be navigable, a waterway remains so." United States v. AppalachianElectric Power Co., 311 U.S. 377, 408, 61 S.Ct. 291, 299,85 L.Ed. 243 (1940); Goodman v. City of Crystal River,669 F. Supp. 394 (M.D.Fla. 1987).
Under applicable federal jurisprudence, a "navigable waterway" of the United States is a waterway which is used or even susceptible of use in its ordinary condition as a highway for commerce over which trade or travel may be conducted in customary modes of trade and travel on the water. As previously stated, pages 2 and 5 above, the U.S. Army Corps of Engineers has declared these waters to be navigable waters of the United States subject to federal jurisdiction under the Commerce Clause, U.S. Constitution, Art. I, § 8, Cl. 3. Thus, the determination of actual navigability and navigability in law has long ago been determined by the appropriate federal agency and all applicable rules of law apply.
STATE AND FEDERAL NAVIGATIONAL SERVITUDES, PUBLICOWNERSHIP
It is clear that under both state and federal law, the waters of Gassoway Lake are navigable waters both of the State and of the United States. See Nevels v. State, 665 So.2d 26
(1st Cir. 1995), decided recently by the First Circuit Court of Appeal, and holding that Yucatan Lake, like Gassoway Lake, is a former bendway of the Mississippi River; had been part of the navigable waters of the United States regularly used by commercial traffic until it was cut off from the river; communication with the river was still maintained during periods of high water; and such rights arising pursuant to the federal navigational servitude are no greater than the rights afforded under Louisiana law, citing La. R.S. 9:1101 and Civil Code Articles 450, 456 and 499.
In this connection, it should be mentioned that La. R.S.9:1101, enacted by the Legislature in 1910 to resolve disputes of the type at hand, provides as follows:
 The waters of and in all bayous, rivers, streams, lagoons, lake and bays, and the beds thereof, not under the direct ownership of any person on August 12, 1910, are declared to be the property of the state. There shall never be any charge assessed against any person for the use of the waters of the state for municipal, industrial, agricultural or domestic purposes.
 While acknowledging the absolute supremacy of the United States of America over the navigation on the navigable waters within the borders of the state, it is hereby declared that the ownership of the water itself and the beds thereof in the said navigable waters is vested in the state and that the state has the right to enter into possession of these waters when not interfering with the control of navigation exercised thereon by the United States of America. This Section shall not affect the acquisition of property by alluvion or accretion.
According to the law of Louisiana, Legislative enactments are presumed to be valid and to have meaning, and all statutory provisions are to be given effect wherever possible. SeeChappuis v. Reggie, 62 So.2d 92 (Sup.Ct. 1952);Jordan v. LeBlanc and Broussard Ford, Inc., 332 So.2d 534
(3d Cir. 1976); and Colwell v. State, 506 So.2d 941
(1st Cir. 1987). Here, it should be noted that no claims to ownership or control of Gassoway Lake adverse to the general public were made until at least the late 1970's or early 1980's, long after passage of this statute, and then only indirectly by the fencing of the roadway. No direct claims or demands have ever been made against the State or its authority pertaining to the subject waters.[7]
While private claimants might raise arguments concerning the use or "taking" of property which they claim to derive through a chain of title, they cannot argue that the lake bed is free of state and federal navigational servitudes under the particular circumstances found here. Thus, the public-at-large has a free and unlimited right to use the waters of Gassoway Lake, provided they have a route of access to these waters.
PUBLIC ACCESS AND IMPLIED DEDICATION OF PUBLIC ROAD
It is beyond dispute that the access road constructed by the East Carroll Parish Police Jury from State Highway 65 was maintained by the Police Jury on an official basis for a period of twenty (20) years or more, as partially recited above. Louisiana law provides that all roads and streets which have been kept up, maintained or worked for a period of three (3) years by a parish or municipal governing authority shall be deemed to be public roads or streets if there is actual or constructive knowledge of such work by adjoining landowners, which is presumed if the total period of such maintenance is four (4) years or more. La. R.S. 48:491[8]
The courts of our state have upheld the validity of these statutes since their passage in 1818, shortly after statehood, as later amended. For instance, in Robinson v. Beauregard ParishPolice Jury, 351 So.2d 113 (La. 1977) the Supreme Court held that maintenance or work on a road by the Parish Police Jury for a period of three (3) years would constitute the road becoming public by implied or tacit dedication of a servitude of passage. Further, that abandonment of such a public road must be evidenced by a formal act of revocation in accordance with the statutes; relocation of the public road by the governing authority; clear and well established proof of intent by the governing body to abandon; or non-use of the strip of land as a public road or street for a period in excess of ten (10) years.[9]
See Wise v. Key, 445 So.2d 98 (2d Cir., 1984);Tschirn v. Morse, 394 So.2d 286 (1st Cir. 1980); Town of Sorrento v. Templet, 255 So.2d 246 (1st Cir. 1971); Winn Parish Police Jury v. Austin, 216 So.2d 166
(2d Cir. 1968). See also, Opns. Atty. Gen. 76-1653; 77-973; 77-1624; 80-1551; 81-942; 83-181; 84-55; 84-55; 84-314; 84-332; 84-469; 87-466; 88-461; 88-479; 89-545; 92-343; 93-71; 93-597; 95-101; 95-101(A).
BLOCKAGE OF A HIGHWAY OF COMMERCE
In the instant matter, a fence has been placed across the publicly worked road, thereby blocking it to public passage, constituting the obstruction of a highway of commerce without any lawful authority from the Police Jury.
The Louisiana Criminal Code specifically prohibits blockage of a highway of commerce under La. R.S. 14:96, the pertinent provisions of which read as follows:
 Aggravated obstruction of a highway of commerce is the intentional or criminally negligent placing of anything, or performance of any act, on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, wherein it is foreseeable that human life might be endangered.
The simple obstruction of a highway of commerce is also prohibited by La. R.S. 14:97, as follows:
 Simple obstruction of a highway of commerce is the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, which will render movement thereon more difficult.
Further, even the obstruction of a public passage is prohibited by the La. R.S. 14:101, as follows:
 No person shall willfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, water craft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.
Lastly, the Revised Statutes provide in La. R.S. 48:512 that a public road or street shall not be closed or obstructed except upon order of the parish governing authority, which shall summarily open same and will remove all obstructions at the expense of the person who closed, obstructed or changed the public road or street, in the following language:
 A. No person shall close, obstruct, or change any legal road, public road or street, as defined in R.S. 48:491 and being a parish or municipal road, except upon order of the governing authority of the parish
for a parish road, whether or not within a municipality, or upon order of the governing authority of the municipality for a municipal road, except as hereinafter provided.
 B. If any public road or street is closed, obstructed, or changed in violation of the provisions of this Section, the governing authority of the parish
or the governing authority of the municipality shall summarily open the road, remove all obstructions therefrom, and restore it to its former condition, at the expense of the person who closed, obstructed, or changed the public road or street. (Emphasis ours.)
Thus, under the cited statutes, both criminal prosecution and civil proceedings may be instituted with respect to the blockage of the access roadway from Highway 65 to the boat launch at the water's edge of Gassoway Lake, as constructed by the East Carroll Parish Police Jury and maintained by it for a period of many years. It therefore becomes the affirmative duty of the Police Jury, as directed by law, to remove the obstruction and restore this public road to public usage.
CONCLUSION
Based on the facts recited above and the history of the origin and development of Gassoway Lake, in conformity with State and Federal jurisprudence pertinent to the areas discussed, we conclude that Gassoway Lake is a naturally navigable body of water under both State and Federal law and actually supports navigation for such purposes as hunting, fishing, trapping and for limited commercial purposes, in addition to recreational purposes. The U.S. Army Corps of Engineers had determined that Gassoway Lake constitutes navigable waters of the United States and has made the same findings in the exercise of its regulatory jurisdiction.
Under both State and Federal law, Gassoway Lake is subject to State and Federal navigational servitudes and the rights of public access and use of the waters supersede any claim of private ownership.
The East Carroll Parish Police Jury constructed and maintained an access road and boat launch on Gassoway Lake for a period of many years, far in excess of the legal requirements for implied or tacit dedication of a servitude of passage. The roadway and boat launch thus constructed and maintained at public expense constitute a highway of commerce dedicated to public usage by operation of law, and blockage thereof constitutes a violation of both criminal and civil statutes which require the removal of the obstruction to public passage.
Based upon the information made available to us, the public has a legal right of access over and across private lands traversed by the roadway constructed by the Police Jury, to the waters of Gassoway Lake.
There is no authority for private interests to close, block or obstruct access and use of the roadway, boat launch or the waters of the Gassoway Lake by the public at large, such actions being completely contrary to the numerous cited provisions of Louisiana Law. Prescription cannot cause the loss of the public status of these taxpayer funded improvements. Under the circumstances, it is the mandatory duty of the parish governing authority to summarily open the roadway, at the expense of the person who closed or obstructed it, along the entire route to the waters edge. This action may be accomplished through both criminal and civil proceedings under the cited authorities.
We hope this opinion is of benefit to you and if we may be of further assistance, please advise us.
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: ____________________________________________ GARY L. KEYSER Chief, Lands Natural Resource Section
RPI/GLK/bb
Because of your earlier interest in Gassoway Lake, I thought you would interested in this opinion. See "Conclusion" for quick reference to the holding of the opinion.
[1] Fisk, H.N. (1944). Geological Investigation of the Alluvial Valley of the Lower Mississippi River (MRC). Analysis of the meander loops and scars and a comparison with maps of comparable scale show the river meandering through this area prior to state sovereignty in 1812 and thereafter. The neck cutoff most closely associated with the current configuration is time-dated in the literature as 1830. See Bibliography.
[2] U.S. Army Corps of Engineers Flood Control and Navigation Series, map no. 29, all years. See note 5, infra.
[3] The State of Louisiana entered the union in 1812, and upon admission, title to the beds of all navigable bodies of water such as the Mississippi River inured to the State as an incident of sovereignty on an equal footing with the original thirteen colonies. See Pollards Lessee v. Hagen,44 U.S. 212 (1844). While generally a patent from the United States is the highest evidence of title and carries with it a presumption of regularity and validity and is conclusive as to all matters properly determinable by the officials issuing it, a patent cannot convey title to land which came into existence after the issuance of the patent and its delivery, nor does it convey title which was not subject to disposition. See Ricev. U.S., 348 F. Supp. 254 (1972) affirmed at 479 F.2d 58
(1973), cert denied 94 S.Ct. 66, 414 U.S. 858, 38 L.Ed.2d 108
(1973); St. Louis Smelting and Symbol Refining Co.v. Kemp, 104 U.S. (14 Otto) 633 (1882), [courts of equity have the legal power to correct mistakes and to give proper relief where it is clear that officials of the Government Land Office, by a mistake of fact or of law, have given land to one which belongs to another.] A patent is void and without effect if the United States did not own the land, as here; Knight v.United Land Ass'n., 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974
(1891); Davis v. Weibold, 139 U.S. 507, 11 S.Ct. 628,35 L.Ed. 238 (1891); Coffee v. Groover, 123 U.S. 1,8 S.Ct. 1, 31 L.Ed. 51 (1885); or had previously conveyed it; IronSilver Min. Co. v. Campbell, 135 U.S. 286,10 S.Ct. 765, 34 L.Ed. 531 (1887), Walden v. Kneavals, 114 U.S. 373,5 S.Ct. 898, 29 L.Ed. 167 (1885); or it was granted under an erroneous impression of the law and without authority; Morrisv. United States, 194 U.S. 196, 19 S.Ct. 649, 42 L.Ed. 946
(1888). See Federal and State Lands inLouisiana, by John L. Madden at pages 97 and 98.
It is interesting to note that Davis v. Weibold,supra, citing St. Louis Smelting, supra at page 13, and others, have stated: " . . . but if the lands patented were not at the time public property, having been previously deposed of, or no provision had been made for their sale or other disposition, or they had been reserved from sale, the department had no jurisdiction to transfer the land, andtheir attempted conveyance by patent is inoperative andvoid, no matter with what seeming regularity the formsof law have been observed." (11 S.Ct. 628, at 636, emphasis added).
[4] The area now occupied by Gassoway Lake and surrounding lands were subject to inundation by reason of their proximity to the river. Both through-flow and overbank flow occurred after cut-off on an annual basis. In recent times, overflow and through-flow occurs by entry of high waters through a lake in the vicinity of what is now known as Bill Lake and Little Gassoway Lake, and well as several large unnamed tributaries.
[5] This development also raises the issue of whether a previously frozen thalweg/interstate boundary (1830) may be "thawed" and re-located by subsequent avulsive action, a question never specifically answered in the jurisprudence. As to boundary, the "live thalweg" of the navigable channel of the Mississippi River defines the boundary between states. However, the boundary may become fixed when, by avulsive action, the stream suddenly leaves its old bed and forms a new one.Louisiana v. Mississippi, 202 U.S. 1, 104 S.Ct. 1645,50 L.Ed. 913 (1984); Houston v. Thomas, 937 F.2d 247 (5th Cir. 1991); Arkansas v. Tennessee, 246 U.S. 158, at 173,175, 38 S.Ct. 301, at 304, 305, 62 L.Ed. 638 (1918); Arkansasv. Tennessee, 397 U.S. 88 at 89-90, 90 S.Ct. 784, 785,25 L.Ed 73 (1970).
[6] See note 3.
[7] Even in the case of non-navigable waters, the public has a right of access and use to "running waters". The Louisiana Supreme Court has upheld and embroidered on the concepts of the Civil Code that "Public things that belong to the State are such as running waters, * * * ", which may be used by the riparian owner for his purposes, but not such as to interfere with nor prevent its use by the general public. See Art. 450, supra, p. 6. The Court noted and analyzed the juxtaposition of private versus public things, as follows:
 On the one hand, the bed and bottom of a non-navigable river or stream is a private thing belonging either to the riparian owners or the state (depending upon whether it was originally non-navigable or navigable — see Wemple v. Eastham, 150 La. 247, 90 So. 637 (1922). On the other hand, the water which traverses that private bed is a public thing. ("Public things that belong to the state are such as running waters, . . . " La. C.C. art. 450.) As such, the riparian owner may use the running water for his purposes, but he may not interfere with, nor prevent, its use by the general public. La.C.C. C Arts. 657 and 658; Yiannoupoulous, 2 La.Civ. Law Treatise § 36, 99 et seq. (2d ed. 1980). Therefore the possessor of the bed, or owner for that matter, may not fence or enclose the "land" so as to impede the use of the flowing water. Chaney v. State Mineral Board, 444 So.2d 105, 109 (La. 1983).
In Chaney, the evidence at trial showed that the Amite River, non-navigable in this portion, still carried water over its bed which had long been used for "fishing, swimming, wading, tubing, stone skimming, digging for claims and even baptizing church members". (At p. 111). The Supreme Court found that the public at large was using the bed and bottom of a non-navigable river for numerous private purposes, and held them to be lawful and permissible uses of the bed under the Civil Code.
[8] The relevant language of the statute is as follows:
 B. (1)(a) All roads and streets in this state which have been or hereafter are kept up, maintained, or worked for a period of three years by the authority of a parish governing authority within its parish, or by the authority of a municipal governing authority within its municipality, shall be public roads or streets, as the case may be, if there is actual or constructive knowledge of such work by adjoining landowners exercising reasonable concern over their property.
[9] The courts have held that failure to continue maintenance caused by a property owner's action in erecting an obstruction across a roadway does not cause loss of the public status of the roadway by prescription. Lincoln Parish Police Jury v.Davis, 559 So.2d 935 (2d Cir., 1990).